IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

CAROL OWENS POLLOCK,

          Plaintiff,

          v.                                    Civil Action No. 2:09-CV-32

MICHAEL J. ASTRUE,
Commissioner of Social Security,

          Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I.  Introduction**

A.     Background

       Plaintiff, Carole Pollock (Claimant), filed a Complaint on March 10, 2009, seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on May 18,

2009.[2]  Claimant filed her Motion for Summary Judgment on July 22, 2009.[3]  Commissioner

filed his Motion for Summary Judgment on September 16, 2009.[4]

B.     The Pleadings

       1.     Plaintiff's Brief in Support of Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 12.

[4] Docket No. 16.

2. <u>Defendant's Brief in Support of Motion for Summary Judgment</u>.

C.    <u>Recommendation</u>

I recommend that:

1.    Claimant's Motion for Summary Judgment be **DENIED** and the action be **REMANDED**.  There was substantial evidence supporting the ALJ's decision to discredit Claimant's testimony; however, the ALJ failed to explicitly indicate the weight given to the relevant medical evidence.

2.    Commissioner's Motion for Summary Judgment be **DENIED** for the same reason set forth above.

## II.  Facts

A.    <u>Procedural History</u>

Claimant filed an application for Supplemental Security Income (SSI) on October 19, 2006, alleging disability since October 2, 2006, due to diabetes, hepatitis C, and depression.  (Tr. 121, 144).  The claim was denied initially on January 18, 2007, and upon reconsideration on April 26, 2007.  (Tr. 72, 85).  Claimant filed a written request for a hearing on June 25, 2007. (Tr. 91).  Claimant's request was granted and a hearing was held on July 22, 2008, (Tr. 31-67), and a supplemental hearing was held on September 24, 2008.  (Tr. 18-30).

The ALJ issued an unfavorable decision on October 30, 2008.  (Tr. 5-17).  The ALJ determined Claimant was not disabled under the Act because Claimant had the residual functional capacity to perform medium work as defined in 20 C.F.R. 404.1567(c) and was capable of performing past relevant work as a bookkeeper. (Tr. 15-16).  On November 19, 2008, Claimant filed a request for review of that determination.  (Tr. 4).  The request for review was

denied by the Appeals Council on January 16, 2009.  (Tr. 1).  Therefore, on January 16, 2009, the ALJ's decision became the final decision of the Commissioner.

Having exhausted his administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.    Personal History

Claimant was born on February 17, 1950, and was fifty-six (56) years old as of the onset date of his alleged disability and fifty-eight (58) as of the date of the ALJ's decision.  (Tr. 37). Claimant was therefore considered a "person of advanced age," age 55 or older, under the Commissioner's regulations.  20 C.F.R. §§ 404.1563(c), 416.963(c) (2008).  Claimant graduated from high school, was a registered veterinary technician in Ohio in the 1970s, and worked as a bookkeeper from February 1990 until October 2, 2006.  (Tr. 41, 52, 144, 148).

C.    Medical History

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's determination that Claimant's subjective complaints were not entirely credible:

**Physical Residual Functional Capacity Assessment, Tim Huffman, 1/17/2007 (Tr. 159-68)**
Physical Assessment:
- Exertional Level: Medium
- Restrictions: N/A
Mental Assessment:
- Limitations: Non-Severe
- Restrictions: N/A
Previous Transferable Skills: not material
Claimant can perform past work as described
Exertional Limits
- occasionally lift: 50 pounds
- frequently lift: 25 pounds
- stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday

3

- push and/or pull (including operation of hand and/or foot controls): unlimited

Postural Limits:  none

Manipulative Limits: none

Visual Limits: none

Communicative Limits: none

Environmental Limits: none

**Physical Residual Functional Capacity Assessment, Thomas Lauderman, DO, 4/24/07 (Tr. 383-90)**

Exertional Limitations:
- occasionally lift: 50 pounds
- frequently lift: 25 pounds
- stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- push and/or pull (including operation of hand and/or foot controls): unlimited

Postural Limitations: none

Manipulative Limitations: none

Visual Limitations: none

Communicative Limitations: none

Environmental Limitations:
- extreme cold: unlimited
- extreme heat: unlimited
- wetness: unlimited
- humidity: unlimited
- noise: unlimited
- vibration: unlimited
- fumes, odors, dusts, gases, poor ventilation: unlimited
- hazards: avoid even moderate exposure – history of hyperglycemia and will need to monitor heights and hazards

**Garrett County Memorial Hospital, Emergency Visit & Stay 10/2/2006 (Tr. 192-258)**
- 10/2 - chief complaint: sick; 100 pound weight loss; decrease in energy (Tr. 193)
- 10/2 assessment: (Tr. 196-97)
  - new diagnosed uncontrolled diabetes with ketoacidosis
  - fatigue, possibly cardiac, possibly secondary to the uncontrolled diabetes
  - hyponatremia secondary to possibly dehydration
  - abnormal EKG
  - elevated LFTs
  - hypomagnesemia
  - weight loss; also secondary diabetes
  - history of polysubstance abuse
  - decreased urination
  - denies numbness or tingling in hands or feet
- 10/3 radiology report (Tr. 227)

- reason for exam: weakness
- results: lungs are hyperinflated but relatively clear; do not see any infiltrates; cardiac silhouette is not enlarged; no effusions
- impression: hyperinflation; no acute appearing abnormalities are identified
- 10/3 radiology report (Tr. 228)
  - reason for exam: us liver
  - results: gallbladder is normal; no calculi; no biliary dilatation; common duct measures around 3 mm in diameter; multiple hypoechoic areas are seen throughout the liver; right kidney is seen well enough to exclude hydronephrosis
  - impression: heterogeneous liver with multiple hypoechoic areas; raises the possibility of metastatic disease; CT imaging is recommended; no gallstones
- 10/4 radiology report (Tr. 229)
  - reason for exam: hepatic lesions - with and without contrast
  - results: no definite pulmonary nodules or masses; no adenopathy or mass in mediastinum or hilar areas; no effusions; no significant axillary adenopathy; lungs appear hyperinflated; minimal areas of pleural based scarring seen in posterior aspect of right hemithorax; multiple hepatic lesions present; no adrenal masses; no abnormalities in kidneys, spleen, pancreas, and gallbladder
  - impression: multiple almost enumerable small hepatic lesions; fat-containing anterior abdominal wall periumbilical hernia
- 10/6 radiology report (Tr. 230)
  - reason for exam: fever of unknown origin
  - impression: infiltrate is suspect in the right lung base
- 10/3 Consultation Dr. Porter (Tr. 231-32)
  - Assessment: multiple hepatic lesions of unclear etiology
  - Plan: will plan CT biopsy of liver; likely administer endoscopy and colonoscopy
- 10/5 Consultation Dr. Walch (Tr. 233-34 & 275-76)
  - preoperative diagnosis: history of 100 pound weight loss; history of multiple hepatic lesions by CT and ultrasound
  - postoperative diagnosis: history of 100 pound weight loss; history of multiple hepatic lesions by CT and ultrasound; mild gastritis and mild duodenitis
  - operation: upper endoscopy of stomach, esophagus, and duodenum with CLO and path biopsy of stomach and path biopsy of duodenum
  - operative findings: essentially normal esophagus; mild gastritis; mild duodenitis
  - plan: proton pump inhibitor therapy; treat for H. Pylori; check liver biopsy
- 10/5 Consultation with Dr. Reyes (Tr. 235-36)
  - preoperative diagnosis: 100 lb weight loss; multiple hepatic lesion
  - postoperative diagnosis: rule out celiac disease
- 10/5 Consultation with Dr. Thompson (Tr. 237-39)
  - preoperative diagnosis: liver lesions; hepatitis C
  - comment: sections reveal chronic hepatitis with increased numbers of chronic inflammatory cells within the portal tracts as well as foci of chronic inflammatory cells within the liver lobule; increased fibrosis with bridging fibrosis and focal fibrosis around central veins; increased reticulum fibers; findings are consistent

with chronic hepatitis with moderate activity and bridging fibrosis
- 10/9 discharge summary: (Tr. 196-97)
  - Type 2 diabetes - uncontrolled
  - symptomatic hyperglycemia
  - diabetic ketoacidosis from relative insulin deficiency
  - Hepatitis C-viral load and type pending
  - liver masses - pathology pending
  - fever
  - pneumonia and bronchitis
  - gastritis
  - anemia-chronic
  - dehydration, resolved
  - hypokalemia
  - hypomagnesemia
  - hypophosphatemia
  - hyponatremia, resolved

**Radiology Report, Garrett County Memorial Hospital, James Benjamin, M.D., 10/2/06 (Tr. 261)**
reason: weakness
results: lungs are hyperinflated but relatively clear; no infiltrates; cardiac silhouette is not enlarged; no effusions
impression: hyperinflation; no acute appearing abnormalities are identified

**Radiology Report, Garrett County Memorial Hospital, James Benjamin, M.D., 10/3/06 (Tr. 262)**
reason: US liver
results: gallbladder is normal; no calculi; no biliary dilatation; common duct measures around 3 mm in diameter; multiple hypoechoic areas seen throughout the liver; no hydronephrosis
impression: heterogeneous liver with multiple hypoechoic areas; raises possibility of metastatic disease; CT imaging is recommended; no gallstones

**Radiology Report, Garrett County Memorial Hospital, James Benjamin, M.D., 10/3/06 (Tr. 266)**
reason: hepatic lesions - with and without contrast
results: no definite pulmonary nodules or masses; no adenopathy or mass in mediastinum or hilar areas; no effusions; no significant axillary adenopathy; lungs appear hyperinflated; multiple hepatic lesions - could be due to metastatic deposits; no adrenal masses. No abnormalities in kidneys, spleen, pancreas, or gallbladder; no suspicious adenopathy or mass within pelvis
impression: multiple almost small hepatic lesions; not simple cysts on a previous ultrasound; fat-containing anterior abdominal wall periumbilical hernia

**Radiology Report, Garrett County Memorial Hospital, Charles Magal, M.D., 10/4/06 (Tr. 270)**

reason: fever of unknown origin
impression: infiltrate is suspect in right lung base

**Radiology Report, Garrett County Memorial Hospital, James Benjamin, M.D., 10/5/06 (Tr. 295)**
reason: CT guided liver biopsy; liver lesions
impression: uncomplicated CT guided core biopsy as well as aspiration for microbiology of two of the many lesions throughout the liver.

**Progress Note, Wellspring Family Medicine, PC, Richard Porter, DO, 10/16/06 (Tr. 289-93)**
Chief Complaint: Type 2 diabetes
Assessment: diabetes mellitus 2, uncontrolled 250.02; fatigue 780.79; chronic hepatitis C without mention of hepatic coma 070.54

**Progress Note, Wellspring Family Medicine, PC, Richard Porter, DO, 10/31/06 (Tr. 297-300)**
Chief Complaint: follow-up; type 2 diabetes
Assessment: diabetes mellitus 2, uncontrolled 250.02; fatigue 780.79; chronic hepatitis C without mention of hepatic coma 070.54; phlebitis/thrombophlebitis of superficial veins of upper extremity 451.82

**Progress Note, Wellspring Family Medicine, PC, Richard Porter, DO, 12/4/06 (Tr. 326-28)**
Chief Complaint: follow-up; type 2 diabetes
Assessment: diabetes mellitus 2, uncontrolled 250.02; fatigue 780.79; chronic hepatitis C without mention of hepatic coma 070.54; phlebitis/thrombophlebitis of superficial veins of upper extremity 451.82; depressive disorder 311

**Progress Note, Wellspring Family Medicine, PC, Richard Porter, DO, 12/18/06 (Tr. 333-37)**
Chief Complaint: follow-up; type 2 diabetes
Assessment: diabetes mellitus 2, uncontrolled 250.02; fatigue 780.79; neuropathy 337.0; chronic hepatitis C without mention of hepatic coma 070.54; depressive disorder 311

**Progress Note, Wellspring Family Medicine, PC, Richard Porter, DO, 3/5/07 (Tr. 355-58)**
Chief Complaint: follow-up; type 2 diabetes
Assessment: diabetes mellitus 2, uncontrolled 250.02; R/O hyperlipidemia 272.4; fatigue 780.79; neuropathy 337.0; chronic hepatitis C without mention of hepatic coma 070.54; depressive disorder 311; cyanosis 782.5

**Progress Note, Wellspring Family Medicine, PC, Kenneth Buczynski, MD, 3/13/07 (Tr. 359-62)**
Chief Complaint: annual exam
Assessment: routine gynecological examination V72.31; weight gain, abnormal 783.1; diabetes mellitus type 2, uncontrolled 250.02

**Progress Note, Wellspring Family Medicine, PC, Richard Porter, DO, 4/2/07 (Tr. 548-53)**
Chief Complaint: follow-up type 2 diabetes
Assessment: diabetes mellitus type 2, uncontrolled; diabetic nephropathy; R/O hyperlipidemia; neuropathy; chronic hepatitis C without mention of hepatic coma; depressive disorder; cyanosis

**Progress Note, Wellspring Family Medicine, PC, Richard Porter, DO, 5/29/07 (Tr. 554-56)**
Chief Complaint: follow-up type 2 diabetes
Assessment: diabetes mellitus type 2, uncontrolled; diabetic nephropathy; R/O hyperlipidemia; neuropathy; chronic hepatitis C without mention of hepatic coma; depressive disorder; cyanosis; sinusitis, acute

**Progress Note, Wellspring Family Medicine, PC, Richard Porter, DO, 7/19/07 (Tr. 557-60)**
Chief Complaint: follow-up type 2 diabetes
Assessment: diabetes mellitus type 2, uncontrolled; diabetic nephropathy; R/O hyperlipidemia; neuropathy; chronic hepatitis C without mention of hepatic coma; depressive disorder; cyanosis; sinusitis, acute

**Progress Note, Wellspring Family Medicine, PC, Richard Porter, DO, 10/29/07 (Tr. 563-69)**
Chief Complaint: follow-up type 2 diabetes
Assessment: diabetes mellitus type 2, uncontrolled; diabetic nephropathy; neuropathy; chronic hepatitis C without mention of hepatic coma; cyanosis; major depression (single episode); diabetes with renal manifestations, type II or unspecified type, not stated as uncontrolled; hyperpotassemia; other anomalies of pupillary function

**Progress Note, Wellspring Family Medicine, PC, Kenneth Buczynski, MD, 11/1/07 (Tr. 561-62)**
Chief Complaint: immunization injection
Assessment: need for Hep A vaccination (viral hepatitis)

**Progress Note, Wellspring Family Medicine, PC, Richard Porter, DO, 11/5/07 (Tr. 573)**
Chief Complaint: vision check
Assessment: general medical exam, adult

**Progress Note, Wellspring Family Medicine, PC, Kenneth Buczynski, MD, 11/12/07 (Tr. 570-72)**
Chief Complaint: cough
Assessment: cough; bronchitis, acute; R/O pneumonia

**Progress Note, Wellspring Family Medicine, PC, Richard Porter, DO, 10/10/07 (Tr. 574-79)**
Chief Complaint: follow-up type 2 diabetes
Assessment: diabetes mellitus type 2, uncontrolled; diabetic nephropathy; fatigue; chronic hepatitis C without mention of hepatic coma; cyanosis; major depression; diabetes with renal manifestations, type II or unspecified type, no stated as uncontrolled; hyperpotassemia; other anomalies of pupillary function

**Progress Note, Wellspring Family Medicine, PC, Richard Porter, DO, 3/12/08 (Tr. 580-86)**
Chief Complaint: follow-up type 2 diabetes; "I'm tired all the time;" follow-up depression
Assessment: diabetes mellitus type 2, uncontrolled; diabetic nephropathy; fatigue; neuropathy; chronic hepatitis C without mention of hepatic coma; cyanosis; major depression; diabetes with renal manifestations, type II or unspecified type, no stated as uncontrolled; hyperpotassemia; other anomalies of pupillary function

**Progress Note, Wellspring Family Medicine, PC, Kenneth Buczynski, MD, 4/24/08 (Tr. 587-90)**
Chief Complaint: annual exam
Assessment: routine gynecological examination

**Progress Note, Wellspring Family Medicine, PC, Richard Porter, DO, 5/2/08 (Tr. 591-93)**
Chief Complaint: nasal congestion
Assessment: rhinitis, allergic; vomiting; obstructive chronic bronchitis, with acute exacerbation

**Progress Note, Wellspring Family Medicine, PC, Richard Porter, DO, 6/19/08 (Tr. 595-600)**
Chief Complaint: follow-up type 2 diabetes; "I'm tired all the time;" follow-up depression
Assessment: diabetes mellitus type 2, uncontrolled; diabetic nephropathy; fatigue; neuropathy; chronic hepatitis C without mention of hepatic coma; cyanosis; major depression; diabetes with renal manifestations, type II or unspecified type, no stated as uncontrolled; hyperpotassemia; other anomalies of pupillary function

**Renal Outpatient Progress Note, Cumberland Nephrology & Internal Medicine, PA, Joseph Kariyil, MD, 12/20/07 (Tr. 603-6)**
Chief Complaint: outpatient consult for evaluation of proteinuria
Assessment: stage 2 CKD: most likely that diabetic nephropathy is cause for CKD and proteinuria; proteinuria; type 1 DM: well controlled; HTN: blood pressure is high; hyperlipidemia: total cholesterol and HDL levels are acceptable, LDL level is slightly elevated

**Renal Outpatient Progress Note, Cumberland Nephrology & Internal Medicine, PA, Joseph Kariyil, MD, 5/16/08 (Tr. 601-02)**
Reason: stage 2 CKD, proteinuria and HTN. Cough, no hemoptysis; no chest pain or palpitation
Assessment: stage 2 CKD-ARF resolving and creatinine is close to baseline; electrolytes are stable; anemia Hgb and Hct are stable after blood transfusion, but values are below the target range; HTN: BP is high; type 1 DM: well controlled - on insulin

**West Virginia Disability Determination Service, Sharon Joseph, Ph.D., 12/4/06 (Tr. 301-05)**
Chief Complaint: diabetes, hepatitis C and depression
Intellectual Assessment:
• WAIS-III
  • verbal IQ: 112
  • performance IQ: 98

- full scale IQ: 106 (falls in Average Range of intellectual functioning)
    - verbal comprehension index: 122
    - perceptual organization index: 99
- VERBAL SUBTESTS
    - vocabulary: 16
    - similarities: 14
    - arithmetic: 9
    - digit span: 11
    - information: 12
    - comprehension: 10
- PERFORMANCE SUBTESTS
    - picture completion: 11
    - digit symbol coding: 10
    - block design: 11
    - matrix reasoning: 8
    - picture arrangement: 9
- WRAT-3

|  | Raw Score | Standard Score | Grade Score | Absolute Score |
|---|---|---|---|---|
| reading | 47 | 101 | Post-HS | 525 |
| spelling | 45 | 106 | Post-HS | 528 |
| arithmetic | 36 | 90 | 7 | 512 |

Memory: immediate memory is within normal limits; recent memory is moderately impaired; remote memory is within normal limits
Concentration: within normal limits
Objective: appears to have depressive symptoms, which appear to be consistent with major depression
Diagnostic Impression:
- Axis I          major depression, recurrent, moderate; history of alcohol abuse
- Axis II         deferred
- Axis III        diabetes; hepatitis C
Psychological Prognosis: fair

**West Virginia Disability Determination Service, Kip Beard, M.D., 12/14/06 (Tr. 306-10)**
Chief Complaint: allegations of diabetes and hepatitis C
Impression: diabetes mellitus 2, consider diabetic neuropathy by history; hepatitis C with reported history of liver cirrhosis; chronic bronchitis
Summary: soft and nondistended abdomen; liver seems mildly enlarged; no jaundice; gait was not neuropathic

**Psychiatric Review Technique, Frank Roman, Ed.D., 12/27/06 (Tr. 312-25)**

Medical Summary:
- medical disposition: impairment(s) not severe
- category(ies) upon which the medical disposition is based: 12.04 affective disorders
  - depressive syndrome: decreased energy; feelings of guilt or worthlessness

Rating of Functional Limitations:
- restriction of activities of daily living: mild degree of limitation
- difficulties in maintaining social functioning: mild degree of limitation
- difficulties in maintaining concentration, persistence, or pace: mild degree of limitation
- episodes of decompensation, each of extended duration: none

Notes: credible and capable; mental status is WNL; independent in ADLs and appears to follow routine work activities in a low stress setting

### Psychiatric Review Technique, Joseph Kuzniar, Ed.D., 4/23/07 (Tr. 369-82)

Medical Summary:
- medical disposition: impairment(s) not severe
- category(ies) upon which the medical disposition is based: 12.04 affective disorders
  - depression

Rating of Functional Limitations:
- restriction of activities of daily living: none
- difficulties in maintaining social functioning: mild degree of limitation
- difficulties in maintaining concentration, persistence, or pace: mild degree of limitation
- episodes of decompensation, each of extended duration: none

Notes: grossly oriented to person, place, and time. Normal mood and appropriate affect. No psych evaluation or management for depression. Stopped serzone and restarted on amitriptyline; denies any uncontrolled depressive episodes; denies any suicidal ideation.

### Anatomic Pathology Report, Western Maryland Health System, Noel Thompson, M.D., 10/5/06 (Tr. 338-39)

Preoperative Diagnosis: liver lesions, hepatitis C
Procedure Type: CT guided liver biopsy
Microscopic Diagnosis: chronic hepatitis with moderate activity and bridging fibrosis; mild to moderate fatty change; foci of fibrosis with marked acute and chronic inflammation

### Evaluation, WVU Department of Medicine, Kendra Barker, MSN, APRN, BC 3/1/07 (Tr. 345-48)

Impression: chronic hepatitis C infection, genotype 1b: Asx, low level viremia previously, snappy transaminases, early bridging on Bx, post-transfusion acquisition; multiple co-morbidities, including diabetes and mild to moderate depression; question of suicidality in the past

### Garrett County Memorial Hospital, Radiology Report, Dr. Miller, 4/10/07 (Tr. 433)

reason: ABI, cool cyanotic feet
impression: normal ankle brachial indices bilaterally; gradient change in right leg

**Garrett County Memorial Hospital, Radiology Report, Dr. Magal 11/5/07 (Tr. 446)**
reason: left knee pain
impression: normal

**Garrett County Memorial Hospital, Radiology Report, Dr. Magal 11/12/07 (Tr. 449)**
reason: cough
impression: no acute cardiopulmonary process

**Garrett County Memorial Hospital, Radiology Report, Dr. Miller, 6/22/08 (Tr. 434)**
reason: ABD pain
impression: gastric distention due to air is suspected; no other definite abnormality

**Garrett County Memorial Hospital, Radiology Report, Dr. Miller, 6/22/08 (Tr. 435)**
reason: chest pain
impression: no acute change; gastric distention and slight elevation of left diaphragm

**Garrett County Memorial Hospital, Radiology Report, Dr. Miller 6/23/08 (Tr. 436)**
reason: ABD pain; oral contrast via G-tube
impression: negative study except for a low density lesion in the right hepatic lobe and gastric
distention

**Garrett County Memorial Hospital, Radiology Report, Dr. Miller 6/23/08 (Tr. 437)**
reason: SBO. Crohn's DX
impression: negative exam

**Garrett County Memorial Hospital, Radiology Report, Dr. Miller 6/23/08 (Tr. 439)**
reason: oxygen depended
impression: chest for acute change

**Garrett County Memorial Hospital, Mammography Report, Dr. Benjamin 7/19/07 (Tr. 440)**
reason: screening
results: scattered fibroglandular densities in both breasts
impression: need additional imaging evaluation

**Garrett County Memorial Hospital, Mammography Report, Dr. Benjamin 7/24/07 (Tr. 438)**
reason: add VWS of the left breast requested by the radiologist
impression: benign lesions

**Garrett County Memorial Hospital, Operative Report, Dr. Walch, 5/8/07 (Tr. 426-28)**
Preoperative Diagnosis: no previous screening colonoscopy
Postoperative Diagnosis: no previous screening colonoscopy
Findings: small polyps present

Assessment: small polyps, hyperplastic in appearance; no other abnormalities found except for tortuous colon

**Garrett County Memorial Hospital, Emergency Visit & Stay 5/7/08 (Tr. 407-17 & 426-28)**
- History and Physical Dr. Buczynski 5/7/08 (Tr. 408-09)
  - Chief Complaint: weakness and syncope
  - Impression: dehydration, chronic anemia, acute renal failure secondary to hydration, hyponatremia
- Discharge Summary Dr. Buczynski 5/9/08 (Tr. 407)
  - Discharge Diagnosis: acute renal failure secondary to dehydration; gastroenteritis; chronic anemia, likely hemolytic secondary to ribavirin and interferon treatment status post transfusion; type 2 diabetes, controlled; active hepatitis C

**Garrett County Memorial Hospital, Emergency Visit & Stay 5/31/2008 (Tr. 392-406 & 418-25)**
- History and Physical Dr. Porter 5/31/08 (Tr. 394-95)
  - Assessment and Plan:
    - hepatitis C
    - anemia, probably hemolysis
    - hypertension: stable
    - diabetes: stable
    - depression: questionable if this is bipolar; put on Depakote
    - metabolic acidosis: continue to monitor
- Consultation Dr. Zakaluzny 6/1/08 (Tr. 400-01)
  - reason: anemia
  - assessment: recurrent anemia; element of cirrhosis; persistent anemia might be related to the ribavirin therapy
- Consultation Dr. Callis 6/2/08 (Tr. 402-03)
  - Assessment:
    - Axis I        mood disorder
    - Axis II       no diagnosis
    - Axis III      obesity, COPD, hypertension, history of hepatitis C, diabetes mellitus and anemia, and history of kyperkalemia
    - Axis IV      other psychological and environmental problems
    - Axis V       40
- Operative Report Dr. Walch 6/2/08 (Tr. 404-05)
  - preoperative diagnosis: history of anemia, ribavirin use, and hepatitis C
  - posteroperative diagnosis: history of anemia, ribavirin use, and hepatitis C and mild gastritis
  - findings: heme-negative stool on exam day; no esophageal varices; no gastric varices; no evidence of upper gastrointestinal hemorrhage; very mild gastritis, not causing any bleeding; normal duodenum
  - assessment: no upper GI bleeding source; patient is likely anemic from ribavirin
- Discharge Summary Dr. Porter 6/3/08 (Tr. 392-93)

- admission diagnosis: hemolytic anemia secondary to ribavirin
- secondary diagnosis: hepatitis C; chronic anemia from hep. C treatment; hypertension; type 2 diabetes; depression; metabolic acidosis; depression; diabetic neuropathy; chronic obstructive pulmonary disease (COPD); allergic rhinitis; morbid obesity; gastritis; colon polyp.; bridging fibrosis

**Medical Record, Midwest Retina, Mark D. Lomeo, MD, 6/17/07 (Tr. 471-73)**
Chief Complaint: 20 year Hx of floaters
Impression: retinal detachment multiple tears, right eye; vitreous hemorrhage, right eye; latrice degeneration, both eyes; non-proliferative diabetic retinopathy, both eyes; hypertensive retinopathy, OU; senile nuclear cataract, both eyes

**Medical Record, Midwest Retina, Mark D. Lomeo, MD, 6/21/07 (Tr. 468-70)**
Chief Complaint: new flashes and floaters; feels vision is worse in right eye; noticed new dark streaks in vision and a hazy/loss of vision temporally
Impression: retinal detachment multiple tears, treated OD, new finding OS, both eyes; vitreous hemorrhage, persisting OD, new finding OS, both eyes; lattice degeneration, both eyes; non-proliferative diabetic retinopathy, both eyes; hypertensive retinopathy, OU; senile nuclear cataracts, both eyes

**Medical Notes, Dr. Walsh, 4/30/07-6/23/08 (Tr. 474-79)**
4/30/07     Colonoscopy
6/4/07      colonoscopy results
11/9/07     same weight; consider ribavirin
6/23/08     first flu and recall colonoscopy

**Medical Records, WVU Eye Institute 6/28/07-10/15/07 (Tr. 480-95)**
- 6/27/07
  - chief complaint: illegible
- 6/29/07
  - chief complaint: 5/p PPV/EL/St 6
  - impression: illegible
  - plan: illegible
- 7/9/07
  - chief complaint: seeing a little better; black spots in OD since Thursday; eyelids are swollen
  - impression: lattice; illegible
  - plan: illegible
- 7/19/07
  - impression: PO PPV air/fluid x-chang; SFG June 2007; 20 days out from surgery; shimmering light
  - plan: lattice OU needed; illegible
- 7/30/07
  - chief complaint: seeing shimmering lights; floaters; black spots

- • impression: illegible
- • plan: plan RD (illegible)
- • 8/29/07
  - • chief complaint: sees rings of light; floaters; flashes
  - • impression: S/P RD repair
  - • plan: (illegible) pupils before dilation
- • 10/15/07
  - • chief complaint: swollen shut and very red in lid area
  - • impression: illegible
  - • plan: illegible

**Medical Records, University Health Associates 4/13/07-6/16/08 (Tr. 496-520 & 636-37 & 643-44)**
- • 4/13/07
  - • subjective: denies any problematic symptoms at this time; denies nausea, vomiting, abdominal pain; reports bowels are moving normally. Some recent struggles with gaining control over diabetes. Recently changed insulin back to Humalog and Lantus; this caused her to gain a lot of weight.
  - • reason for visit: follow-up for hepatitis C
  - • assessment: hepatitis C being evaluated for treatment
- • 5/21/07
  - • reason: follow-up for hepatitis C
  - • assessment: hepatitis C, genotype 1b with viremic load of 7.3 logs; colon cancer/rectal screening
- • 10/25/07
  - • reason: initiation of hepatitis C treatment and follow-up
  - • assessment: hepatitis C genotype 1B with 21 million copies; set up for initiation of treatment. Had psychiatric evaluation; needs optimal control of diabetes
- • 11/8/07
  - • reason: hepatitis C treatment follow-up
  - • assessment: hepatitis C; currently on 3rd week of combination pegylated interferon and ribavirin therapy - now showing anticipated side effects of treatment, including flu-like symptoms; depression remains stable and continues to improve on her current medication; shown a drop in her demoglobin
  - • plan: continue current management, including pegylated interferon and ribavirin
- • 11/29/07
  - • reason: chronic HCV
  - • assessment: chronic HCV, genotype iB, into 6th week of interferon and ribavirin combination therapy. No mood adverse events; usual aches and pains and some fatigue from her dropping hemoglobin; otherwise, tolerating it okay
- • 12/13/07
  - • reason: chronic HCV on therapy
  - • assessment: doing quite well into her 8th week of treatment for Geno 1 chronic HCV. No mood/psychiatric adverse events. Minimal generic flu-like adverse

events.  Substantial drop in hemoglobin, white count, and platelet count, but tolerating it well with just mild fatigue

- 1/7/08
  - chief complaint: chronic HCV
  - assessment: genotype 1A chronic HCV into her 11th week or so week of therapy. Weight is table; mood is good.  Anemic and tired, but managing.  No obvious new side effects; transaminases are normal.
- 1/24/08
  - reason: follow-up HCV
  - assessment: chronic HCV, genotype 1A; passed 12th week of therapy; quantitative HCV RNA from today will determine whether to continue or stop treatments. Other than fatigue and anemia, she has tolerated it well.  Hemoglobin is down while on modified ribavirin doses.  She will continue same until quantitative HCV RNA is available
- 3/3/08
  - reason for visit: HCV
  - assessment: chronic HCV, genotype 1b; coping therapy with nothing but fatigue
  - plan: continue 3/4 dose interferon and 2+2 ribavirin
- 4/10/08
  - reason: follow-up HCV
  - assessment: other medical problems including diabetes are stable; chronic HCV, genotype 1b
- 6/12/08
  - reason: chronic HCV
  - assessment: chronic HCV, genotype 1b; now complicated by significant anemia requiring transfusions, but without signs of GI tract blood loss from her symptoms.  Now improved, less weak, more active, less tired, and her other labs are all stable or improved
- 7/10/08
  - chief complaint: follow-up HCV
  - assessment: chronic hepatitis C virus, genotype 1B; other medical problems are stable and include diabetes, but a question of worsening eye findings is noted and will be followed carefully; mood abnormality has never been a problem for her during treatment; anemia has resolved, but she has been off ribavirin for 1 month
- 8/25/08
  - reason for visit: follow-up HCV
  - assessment: chronic HCV, genotype 1; been modified many times because of significant cytopenias and because of anemia requiring transfusions.  Doing well; no signs of mood abnormality; beginning to feel a little tired, so will follow up with her hemoglobin today; eye symptoms are from old cataracts or ongoing diabetes

**List of Medications, Wellspring Family Medicine (Tr. 521-41)**

**Medical Records, Regional Eye Associates, 7/8/08 - 8/22/08 (Tr. 638-41)**

- <u>7/8/08</u>
  - CC/HPI: lattice lt S/P PPV; spot right eye; sees flashes
  - Assessment: DMI PDR
  - Diagnostic or Treatment Plan: focal grid OD
- <u>7/25/08</u>
  - CC/HPI: no changes in past 3 weeks since last visit
  - Assessment: S/P PPV 2007; BDR
  - Diagnostic or Treatment Plan: Grid OD
- <u>8/22/08</u>
  - CC/HPI: eyes are getting worse
  - Assessment: S/P PPV OD; increase cat; BDR stable; SP focal
  - Diagnostic or Treatment Plan: rec proceed; risk due to PPV

D.     <u>Testimonial Evidence</u>

Testimony was taken at the hearing held on March 21, 2007. The following portions of

the testimony are relevant to the disposition of the case:

Q     And how tall are you?
A     5' 9".
Q     And what is your current weight?
A     200.
Q     Okay, in the past year or so, has your weight changed, or has it stayed about the
same?
A     It's fluctuated a little bit in the last year or so.
Q     Okay, what about prior to that? I notice in the record, you had some - -
A     I had - - prior to that - - well, I used to weigh almost 400 pounds, but I had a lot -
- a huge weight loss, and when I entered the hospital in October '06, I weighed 136 pounds - -
Q     Okay.
A     - - which was borderline pretty small for somebody with my bone structure and
frame. And - -
Q      So since October of '06, you've went from 136 to your - -
A     To 227, I think, at the highest, and then, back down to 200 in last few months.
Q     Okay, why did you have that large weight increase? Do you know?
A     Well, the weight that I was at when I went into the hospital was because of
several years of personal problems and depression and normal living, bankruptcy. I just did not
have an appetite, and I did not eat, and I worked constantly, so I had worked myself into, almost,
a state of exhaustion by the time I went to the hospital.
ATTY          Okay.
ALJ          And Ms. LaRosa, could you give a year and - - a month and a year for that
hospitalization that's so critical in this testimony?
ATTY          It was October of 2006.

                  \*               \*               \*

Q      Okay, do you have a driver's license?

A      Yes.

Q      How often are you driving?

A      I drive to some of my doctors' appointments in Oakland, Maryland, which is an hour drive from me, when I can, but mostly, my friend who brought me here drives me to my month - - my weekly appointments in Morgantown with Dr. Schmall [phonetic] for my hepatitis treatment, and I try to go out as little as possible. I've been staying home quite a bit.

Q      Is there a reason for that, that you're limiting your driving?

A      Yes, I have a lot mental confusion. I am very dizzy and unstable on my feet. I just get very tired, and when my sugars run low and my medicine for my hepatitis makes me nauseous and - - I just can't drive very well. Plus, most of my driving to Morgantown has been in the winter.

                  \*               \*               \*

A      Excuse me. I've been diagnosed with diabetes, depression, hypertension, hepatitis C, lattice degeneration in my eyes, diabetic retinopathy in my eyes, and neuropathy with my - - I have poor circulation in my hands and my feet and pain.

Q      Okay.

A      I think that pretty much covers it.

Q      Let's start with the liver problems first.

A      Okay.

Q      You said the hepatitis C and the - -

A      Fibrosis.

Q      What doctor currently treats you for these conditions?

A      Dr. John Schmall.

Q      Okay, and how often do you see him?

A      I have been seeing him since October of '07, the 25th. I've saw him every week for labs and checking my labs in regards to the medications he put me on. And then, probably starting in February, I was able to go every three weeks, and then, more recently, every four weeks. And now, I have my next appointment with him in August.

Q      Okay, how are you being treated for these conditions?

A      I take weekly injections of a medication called interferon, and I take capsules of a drug called Ribavirin [phonetic]. Those are the two drugs that I'm being treated for. Oh, and my additional depression medication - -

Q      Okay, but just for the liver, it's the two drugs you've previously mentioned?

A      Yes.

Q      Okay, do you have any side effects from those particular drugs?

A      I have a lot of side effects. I have had - - well, I'm anemic, and I've been - - at the end of May and the beginning of June, each time, a trip to the hospital in Oakland for - - and I was given a blood transfusion because my anemia has gone very, very low.

Q      And you're speaking of this year.

A      This year. That's correct, 2008.

Q      Okay.

A      And again - -

Q    Other side effects.

A    Other side effects: flu-like symptoms, fatigue, extreme fatigue, dizziness, fevers, aching joints, and they're trying to decide whether this treatment has affected my eyes, and a little bit of hair loss, depression, and lack of appetite.  I have no strength.  I have trouble getting out of the bathroom, getting up from the john.  Standing up, if I fall on the floor, it takes me awhile to get up.  I never squat.  And but - - okay, side effects.  I did mention nausea, I do believe, and I vomit.  I sleep excessively.

Q    In an average day, how many total hours are you sleeping?

A    I can sleep 15 to 20 hours a day.

Q    Okay, when did that start?

A    That started with my injections and my Ribavirin.  And I sleep 20 hours a day - - I take my Ribavirin [sic] on Friday, one injection, and I sleep most of Saturday.  I'm up for maybe three or four hours to do the necessary things, and then, I'm back asleep again for Saturday and Sunday, and then, that extreme sleeping is a little bit better throughout the week until I take my next injection.

Q    Okay, and you said the interferon is once a week as well?

A    It's once a week, and I take five tablets of Ribavirin a day.

Q    Okay, do you have extreme symptoms on that day you take that medication?

A    The Ribavirin?

Q    No, the interferon.

A    The interferon, that's what I was mentioning.

Q    Okay, I'm sorry.

A    The shot on Friday.

Q    Okay, I'm sorry.  I was confused.  Has this treatment helped at all?   I mean has your viral load went down?  Have they told you?

A    Yes, it has gone down, and I have - - there's several different types of genotypes within hepatitis C, and I am a 1B, and it is the most difficult genotype of hepatitis C to treat.

Q    Did they explain to you why?

A    Just because treatment for hepatitis is a relatively new and ongoing process, and with a - - and they gave me a 50-50 chance that these medications, this combination of medications, would make my viral load - - it never goes away, but it goes below what they consider detectable.  They tested me at 12 weeks on this medication, and they tested, in the beginning, a viral load, and then, in 12 weeks.  If it hadn't made any difference, they would have taken me off the medication, but it did make a difference, and I'm hoping it will be a sustained response.  My treatment ends in September, and they will take another viral load then.  And then, in six months, Dr. Schmall said - - this is the key factor: in six months, I will go back in and  - - for another viral load, and then, they will decide whether I have what they consider a sustained response.  But hepatitis C, very often, still, comes back.  They don't really know why.  It's something that they are working on.

Q    Okay.

A    And so - - and if it's not treated, some of the problems you can have in the future is liver cancer and a liver transplant, so this is the only treatment at this point in time for hepatitis C.

Q    Now, what's your understanding of the bridging fibrosis, and are they doing

anything to - - that treats that condition?

A        Well, other than riding my body of the hepatitis C, that's what they feel has caused the damage.  And we believe I contracted hepatitis C - - and I had two blood transfusions prior to 1992, one in '80 and one in '83, and they did not have a test for the blood supply to test on hepatitis C until 1992.  So that's how we feel I must have contracted it, and I've had it for all of these years, almost 30 years in theory, so my viral load was very high when I started.

Q        Okay.

A        And - -

Q        Now, your diabetes, who is treating you for the diabetes?

A        Richard Porter.

Q        And how often do you see Richard Porter?

A        I see him once every four weeks.

*           *           *

ATTY        Okay, I would like to ask for you to list for me what medications you're taking for the diabetes.

CLMT        I take Humilog, insulin.

*           *           *

BY ATTORNEY:

Q        Okay, and if you could, tell me what medications you take for diabetes.

A        I take Humilog insulin.  I take Lantis insulin, and I take amitriptyline for my nerve pain and depression and sleep.  And in the past, before my hepatitis treatment, I have never, in my life, slept very well.  I don't sleep well at all until my hepatitis treatment began.

Q        Okay.

A        And I've slept 58 years' worth of time between then and now.

Q        Would you consider your diabetes to be under control?

A        They don't really say that it is under control, although my tests are coming out fine.  The interferon and the Ribavirin really send sugar levels out of control.  It really does wreak havoc  with all of the aspects of my body, so I go from - - I don't go that high with my insulin counts anymore, as long as I take my insulin every day and I eat correctly, but I have been recently crashing really low, another reason why I don't like to drive in the car, because that comes on fairly quickly, and I'm not able to do anything.  I have to just pull over and just sit there and take - - I have emergency glucose tablets that I carry with me at all times, and you have to take some of that and you have to wait because you can't even see right, so - -

Q        Now, when you say you are crashing low, how low is low?  What number?

A        Well, recently - - well, I'm - - 90 to 120 is what they like you to be within, and I am often, in the mornings, 60, and some of my recent most extreme lows was in the hospital the last time for the blood transfusion.  I was in for three days.

Q        And how - -

A         I was 40, and the night before I went home, I was 24.

Q        Okay, and what month was that this year?

A        That was in June.

Q        Okay, tell me about how this has affected your vision?

A        Oh, well, I just - - the diabetes, alone, just caused a severe problem with the prescription that I had for my glasses when I went into the hospital in 2006.  When I got out of

20

the hospital on that visit, these glasses didn't really work anymore, and I can see far, but I can't see up close.  And - - my vision, then, in June of 2007, I was driving to Ohio, and I - - this eye began to bleed internally.

Q     Is that your right or your left?

A     That's my right eye, and - - bleed internally, and - -

ALJ     And I'm going to stop you just for time's sake.  We do have medical records of the bleeding of the eye and the laser surgery in Ohio.

CLMT     Yes.

ALJ     So it may be more efficacious, in terms of our time, to cover matters that aren't in the medical record.

ATTY     Okay, than you.

BY ATTORNEY:

Q     If you could, just briefly describe to me, how do you see, currently?

A     Currently, I see very poorly.  I have a cataract in my right eye that when my medication is done with the hepatitis they need to remove.  And that is a result of surgery that I had on my right eye in 2007, and that's a common side effect of this vitectromy that I had to stop the detached retina and the bleeding in this eye.

Q     Are you able to read, watch TV, focus on a computer screen?

A     It - - with reading glasses, I can see the TV all right, but I cannot read without my glasses and a magnifying glass.

Q     Now, you also mentioned that you have neuropathy.

A     Yes.

Q     Tell me what area of your body it affects, and briefly, describe to me some of the problems that it causes.

A     Well, it mainly affects my feet, and it causes poor circulation, and they get very cold, and then, they get very hot.  It's just very discomforting.  It's painful.  And then, my hands get numb very easy and cold.  When they are cold, they're numb.

Q     The fact that you have the neuropathy in your feet, does it affect how long you're able to stand?

A     Well, sometimes, yes, it does.

Q     How long can you stand before you have to sit?

A     Well, not very long.  I cannot walk - - it depends on how anemic I am. When I'm very anemic, I can hardly walk from my car to my front door?

Q     Which is about how much of a distance?

A     It's not very far.  I don't know, 20'.

Q     Okay, what about on a better day?

A     On a better day?

Q     How far could you walk?

A     Maybe a block or so.  Stairs are hard for me on the days I'm feeling bad.

Q     And as far as your depression, are you currently being treated?

A     Yes.

Q     Richard Porter.

Q     And how often do you see him?

A     Once every four weeks.

Q       And what medication do you take for depression?

A       Amitriptyline, a generic form of Prozac, and most recently, they have given me Depakote.

Q       Okay, any side effects from those medications?

A       They're watching the Depakote.  It causes liver problems, so I have to have more lab tests done so they check the function of my liver with the Depakote.  And no, other than the sleepiness that I'm assuming some of the depression medicine adds to.

Q       Tell me about some of your symptoms with depression.

A       With the depression, well, I cry.  I have a hard time concentrating and remembering what I'm talking about.  Depending on the day, it makes me just sad, and I don't want to go anywhere.  I just want to sit in my chair.  I don't want to see people.  I just try to take it day by day and feel as good as I can as the time goes on and try not to let the fact that I have all of these other diseases and possibilities happening in the future not get me too far down, and I still try to have a very positive outlook on what I can do for myself.

Q       As far as daily activities, are you able to maintain like cooking for yourself, cleaning your home?

A       Well, I don't clean very often.  I - - my appetite is very bad, and I'm nauseous at the smell of most foods.  Its' hard for me to find anything that I want to put in my mouth, so consequently, I do not cook very often, but when I do, I use the microwave, frozen food, something easy to prepare.

Q       Do you do your own shopping?

A       Most of the time, my friend has to take me to the grocery store, and I try to go as far as I can with her, and then she finishes my shopping with me, and so I do have trouble with the shopping aspect.

Q       Do you have any hobbies or any activities that you enjoy?

A       Well, I used to enjoy reading, and I enjoy taking care of my friends and companions.  I have three dogs, and that pretty much takes up all of my time at the moment, just trying to make sure they are fed and let out in between my sleeping.

Q       Okay, and do you belong to any clubs and organizations?

A       No.

*               *               *

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q       The record indicates that you stopped working in 2006 as a bookkeeper.  Does that sound right?

A       Yes.

Q       Do you remember about when in 2006 you stopped working?

A       Well, I went to the hospital October 2 of 2006.

Q       Okay.

A       And when I came out, I was not really able to perform as a bookkeeper.

Q       And why did you go to the hospital in October of 2006?

A       The extreme weight loss.  The - - I was disoriented from malnutrition, I guess, and just, you know, very weak, very tired.  I had worked seven days a week for the past three years, and just generally run down, not taking good care of myself, and just kind of - - and very depressed, just kind of sitting around, waiting - -

22

Q        So - -

A        - - for things to be over.

Q        I'm sorry.  What were you waiting for to be over?

A        Well, I didn't have a lot of good outlook on the future of my life.

Q        So essentially waiting for life to be over, it sounds like.

A        Yeah.

Q        And then, when you were released from the hospital, it sounds like, from the medical records, it was October 9, 2006.

A        That's correct.

Q        You did not go back to work.

A        No.

Q        And why was that?

A        Well, because my job as a bookkeeper requires concentration, accuracy, organization.  I guess mostly that.   Just was trying to recover from being so far down, physically, in the hospital, and couldn't, at that time, walk very far, or go up the stairs at work, those kinds of things.

Q        It sounds like you quit your job.  They didn't fire you.

A        No, we had a conversation, and my boss was very understanding and still is.  She is a good friend of mine.

Q        And then, in the medical records, from that October 2006 hospitalization, it said that you hadn't been to see a physician or at least a year-and-a-half prior to going to the hospital - -

A        That's correct.

Q        - - and that you had uncontrolled diabetes at that time.

A        Yes.

Q        You had also lost at least 100 pounds in that year prior to hospitalization.

A        Yes.

Q        Did you  - - and you had testified that you had, at one point, weight over 400 pounds.

A        Almost 400 pounds, yes, 370-some pound, and that was several years before 100-pounds loss.

Q        Were you one of those folks who took advantage of that gastric bypass surgery, or you just lost - -

A        No.

Q        - - weight by not eating?

A        Um-hum.

Q        I see you nodding your head.

A        That's right.

Q        Okay, and when I raise this, it's not to be uncomfortable, but it's part of the medical record, and I need to ask you about some of these things.  The October 2006 medical records from the hospital, which are in Exhibit 2F also talk about you having a history of alcohol and illegal drug use and that you had been active alcoholic - - or alcohol user, I'll say, until May of 2006.  Does that sound familiar to you?

A        Until May of 2006?  I had - - because I was feeling so bad, I had stopped

23

drinking, probably, for almost a year before I went into the hospital.

Q     Okay.

A     And my prior drug abuse was all when I was very young, in the 70's, and it - -

Q     So if - - this records, Exhibit 2F, and some of the other records, indicate that you stopped drinking in May of 2006.  That would be incorrect?

A     I would say that I stopped drinking probably six months to a year prior to my hospitalization in 2006.

Q     Okay, so six months from October of 2006 would be about April of 2006.

A     Okay, that would be correct, then.

Q     Okay, and then, since then, have you taken that back up as a consumptive habit?

A     I have not.

Q     The records also indicate that - - it looks like you've had - - let's see - - a diabetes diagnosis dating back to 1998.  Would that be about right?

A     Yes.

Q     Okay.

A     Type II diabetes.

Q     The records also indicate - - it looks like you were diagnosed with depression sometime in, gosh, 2006.  Would that be fair to say, or was it sooner than that?

A     It was sooner than that.

Q     Okay, do you remember when you first got diagnosed with depression?

A     It was when I was first diagnosed with the Type II diabetes.

Q     Okay, so that would have been about 1998 as well?  I see you - -

A     Yes, I'm sorry.

Q     When you were diagnosed in 1998 with depression, were you given medication or psychotherapy or was it just kind of a diagnosis that just got thrown into the air?

A     I was given medication.

Q     And what kinds of medication were you taking at that time?

A     It was an antidepressant called  Serzone.

Q     And were you still taking it when you were admitted into the hospital in October of 2006?

A     No, I was not.

Q     When did you stop taking it?

A     I stopped taking it a year prior to 2006 hospitalization.

Q     Okay, was that about the same time when you stopped on the diabetic treatments?

A     From the initial diagnosis of diabetes, yes, on which I was on a Type II medication called Glucovance.  They were pills.

Q     Okay, just so we kind of flesh out the record, was there some reason why you kind of just stopped the diabetic medications and stopped the depression medication at that time?

A     Yes, there is a reason.  I had gone in or one of the local blood screening situations, in which they do lots of - - you give them your blood, and they test it for all different things.  And  my liver enzymes were in the triple digits, and I did already know that the Glucovance and the Serzone, I had to have a liver-function test done when I started on that medication, and I was supposed to have a blood test every six months to judge my liver, because they both affect your liver.

Q        And when you found that the liver enzymes were high, why would you stop all medication and not see a doctor?

A        Well, I did see - - I stopped the medications because I decided with reading and researching that I thought that was part of the raising of the enzymes from those two drugs.  And I was so depressed at that time that I blamed the medication and kind of ignored my situation for that year coming up, and I had gone to they - - what they call a homeopathic doctor in Fairmont, and he was giving me herbs and medication and things like that to try to straighten me up a little bit and make me feel better, and get some weight on and whatever, and obviously, it wasn't helping me.  I was too far gone for herbal, homeopathic-type things.

Q        Yeah, I think the record, as of 2006, would bear that out.

A        Yes.

Q        And then, in terms of the diabetic retinopathy, as I understand it, there is some treatment that is available to you after September of 2008 for the right-eye cataract.

A        Yes, and I will be having laser surgery on the right eye this Friday to try and stop the bleeding prior to the cataract removal.

Q        This Friday being July 25, 2008?

A        That's correct.  And then, on September, I think it is, 24, I have scheduled laser surgery in my left eye.

Q        And what would that be for?

A        Diabetic retinopathy.

Q        But there is no cataract in the left eye?

A        No cataract in this eye, no.

Q        And just so that I am on board with all of this, it looks like this retinopathy was recently diagnosed.

A        Yes.

Q        And I have Exhibit 19F, and it looks like that was done May 30, 2008.

A        That's for my left eye, yes.

Q        For the left eye.  And then on June 28, 2000 - -

A        July 8, was the diagnosis on the right eye.

Q        Okay, thank you.  And apparently, as I understand it, your diabetes medication has not changed.  This is just one of those things that comes from the combination of what's going on for you.

A        Yes.

Q        Okay, you indicated that for your depression you're been seeing Dr. Porter.  What kind of physician is he?

A        He is DO, family practice.

Q        Have you been in any kind of psychotherapy or counseling since he began treating you for depression?

A        I was counseled on my last visit to the Oakland Hospital in June of '08.  That's when they started the Depakote because I had a little freak out and just overwhelmed by all that was going on the anemia and the blood transfusions, and I saw a psychiatrist on Sunday before I was released, and prior to that, I saw a psychiatrist in May of 2007.  I had hoped to be in a clinical trial for my hepatitis C, which was later canceled, and it didn't happen, so I went on regular treatment.  But one of the most serious side effects of interferon and Ribavirin is suicidal

depression, so I had to pass a psychiatrist exam before Dr. Schmall would even allow me to start the treatment.

Q        Okay, but other than the psychiatric visit you had while you were hospitalized in June of 2008, it sounds like you have not been in any kind of counseling, group therapy, or psychotherapy.

A        That's correct.

Q        Okay.

A        The 2008 June visit, that doctor referred me, on release from the hospital, to the Randolph County Mental Health situation, and I did call them, and - - recently, in June, after I got out the hospital, and I couldn't have gotten in to see them until October of this year, so I have not made an appointment.

Q        And then, you had also mentioned - - let me just double check here - - that you can't see up close right now. Is that true with both eyes or just the right eye?

A        It's mostly the right eye.

*                *                *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q        Could you please identify her past work as performed within the last 15 years?

A        Yes, her work is listed as a bookkeeper, and that is sedentary and skilled, Your Honor.

Q        I want you to assume, then, that Ms. Pollock has a residual functional capacity, which I am going to abbreviate as RFC from now on, to perform the following work functions: to occasionally lift and/or carry up to 50 pounds, frequently lift and carry 25 pounds throughout the workday; can stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday; can sit with normal breaks for a total of about six hours in an eight-hour workday; to avoid even moderate exposure to hazards such as machinery or heights; to engage in routine tasks, work in a low-stress environment, defined as having only occasional changes in the work setting and only occasional decision making. Based on that RFC, could she perform any of her past relevant work, as either she actually performed it or as it's customarily performed?

A        No, Your Honor, I don't believe so. The decision making and the low stress I don't believe would be compatible with the bookkeeper position.

Q        Well, let's try this then. From the skilled bookkeeping work that you've identified as her past occupation, are there any transferable skills?

A        Well, she has already said - - I mean there would be - - there wouldn't be transferable skills to another position there from that, no, Your Honor.

Q        Okay, well, let's try this: at the sedentary level, given the fact that Ms. Pollock's past work as a bookkeeper is not available, given the RFC provided, are there any other sedentary jobs which are so similar to her past work as a bookkeeper that she would need to make very little, if any, vocational adjustment, in terms of either tools or process or setting or industry to be occupied?

A        Well, there are some titles, account payable clerk, bill rate clerk. Those would be - - bill rate clerk, for example, it's semiskilled. The accounts payable clerk would be skilled. Those are some ideas.

Q        Given the given the RFC that you've been provided, would  those jobs be

available with the RFC that you've been given?

A No, Your Honor.

Q Why not?

A The same reason. I wouldn't consider them low stress, and there's a lot of decision making in them, still.

Q Well, let's take the residual functional capacity that you've already been given. Are there any unskilled jobs that would potentially be available?

A I believe that RFC because of the stand and walking, Your Honor, would still be best at light.

Q Would there be any unskilled jobs at either the light or sedentary position that would be available?

A Yes, at the light level, that hypothetical individual, I believe, could function as an office assistant, light, 150,000, nationally, 1,850, regionally.

     *    *    *

A At the sedentary level, assembler, 149,000, nationally, 1,450, regionally; or a general sorter, sedentary, 50,000, nationally, 650, regionally.

     *    *    *

Q I'm going to ask you to assume the same RFC with some additional limitations. Her vision, there is no near acuity, and only occasional reading or computer work; has a balance - - no ropes, ladders, or scaffolds being utilized, and only occasional use of stairs or ramps; and there would also be available a sit/stand option throughout the workday as needed. Would there be any occupations available with those additional limitations?

A No, Your Honor, those jobs would all require near visual acuity.

Q You've heard Ms. Pollock's testimony. Assuming that it is found to be completely credible and supported by the medical records, would there be any occupations available to her, given that testimony and the limitations she's alleged?

A No, Your Honor.

     *    *    *

I'll note, as background information, that the original hearing was held on July 22, 2008, at which time Ms. Pollock provided testimony on her own behalf, and at that time, Mr. Bell also appeared as a vocational expert and provided vocational testimony. After the hearing was concluded, this Court reviewed the file and realized that it has erred in presenting some of the RFCs based on the reconsideration information that was in the file, and so I want to thank Ms. LaRosa for returning today so that the Court can correct the record, and I apologize for the inconvenience.

     *    *    *

 EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

 Okay, originally, as you may recall, Ms. Pollock had testified and had talked about her job as a bookkeeper, which you had originally identified as a sedentary exertional level and skilled work as she had actually preformed it. I would like you to frame your questions using the same region that you identified during the July 22, 2008 hearing, that being West Virginia, Eastern Ohio, Western Maryland, and Western Pennsylvania. There has been no new vocational

evidence filed since July 22, 2008, so we're going to be using, essentially, the same vocational information that had been in the file when you appeared on July 22, 2008. And in addition, I'll be relying upon testimonial evidence that was provided on that date as well. The first RFC that I provided you on July 22, 2008 incorrectly utilized some nonexertionals limitations by the original DDS examiner on mental health matters, which did not appear to have been adopted by the subsequent examiner, Dr. Kuzniar [phonetic], when he reviewed the file for reconsideration, so I'm going to identify a new RFC number for today's proceeding as follows. I want you to assume that Ms. Pollock has the residual functional capacity to perform the following work, and it would be, exertionally, a medium-level exertion, which I define as occasionally lift and carry 50 pounds, frequently lift and carry 25 pounds, and stand and/or walk with normal breaks throughout the eight-hour workday. In addition, I want you to consider an environmental limitation of avoiding even moderate exposure to hazards, those being defined as machinery, heights, et cetera. Based on this RFC number one, would Ms. Pollock be able to perform her past work as a bookkeeper, either as he actually performed the work or as its customarily performed?

A      Yes, Your Honor.

Q      I'm going to, then, ask you a second RFC. I want you to assume the same exertional and environmental limitations as in RFC number one, but add the following. For the exertional additions, no climbing of ropes, ladders, or scaffolds, and only occasional climbing of stairs or ramps. Would Ms. Pollock be able to perform her past relevant work as a bookkeeper with this addition - - these additional limitations?

A      Yes, Your Honor.

Q      For the third RFC, I want you to assume the same RFC limitations as provided in the last question, which I identified as RFC number two, but I also want you to assume a postural limitation that there would be a sit/stand option throughout the workday. Given that additional RFC limitation, would Ms. Pollock still be able to perform her work as a bookkeeper?

A      The sit/stand option, as a bookkeeper, if she needed to stand  periodically throughout the workday, that wouldn't eliminate that job.

Q      For the fourth RFC, I want you to assume the same physical RFC as we just discussed in RFC number three, but add the following additional limitation. Because of visual complaints of difficulty with near acuity, only occasional reading and/or computer work. With this fourth RFC, would Ms. Pollock be able to do her past work as a bookkeeper?

A      No, Your Honor.

Q      Would there be other unskilled jobs - - or other jobs either - - well, let me change that. Would there be other jobs that she might be able to perform with the exertional and other limitations in RFC number four, other than past work?

A      And you're wanting that at the medium level?

Q      Medium level.

A      Okay, well, the sit/stand wouldn't - - is not - - would not be allowed at the medium level, no.

Q      Well, then, let me carry this into questions about a transferability. If the sit/stand option puts Ms. Pollock at a light-duty exertional level, from her bookkeeper work, would she have any transferable skills?

A      Going up to light, is that what you're saying?

Q       Yes, as I understand your testimony, you're saying that if I include a sit/stand option throughout the day, that no medium would be available to her, but that light-duty jobs might be.  Would that be a fair summary of your current - - recent testimony?

A       Yes.

Q       Okay, and if only light-duty or potentially sedentary-duty jobs would be available to her with a sit/stand option, could you identify for us whether she has any transferable skills from her bookkeeping work?

A       With a knowledge of bookkeeping, bank teller is at the light level, and there are some bank teller jobs at smaller banks, which would allow for a sit/stand option throughout the day or even have a chair there at the location, so that would be one that would come to mind.  And - -

Q       Okay, why don't I stop you?  What I'm interested in first is to find out what the transferable skills are.  And then, I'm going to ask you about what occupations they might transfer into.

A       Okay, one second here, Your Honor.  Okay, use of a computer, ability to verify numerical figuring, ledgering, compilation of statistics.  Those are the general ones.

Q       Okay, do you have others that you would like to offer?

A       Receipts, ability to process data, reconciliation work.

Q       Okay, then, would any of these skills transfer with the limitations you've been given in the RFC, which I have identified as RFC number four?

A       I believe that that individual would have the ability, from a skill standpoint to do the bank-teller type work.  Most of the work at - - that would be considered transferable would be at the sedentary level, like if you were a bookkeeping clerk, you could be a bill rate clerk.  You could be an accounts payable clerk, an accounting clerk, but those are all at sedentary.

Q       So just so that I am clear, the bank-teller work that you described is a light duty or sedentary?  It wasn't clear to me.

A       It is classified by the DOT as light.  That is what you had asked for.

Q       Yes, I was interested in - - and then, aside from the bank-teller work, you are saying that most of the other jobs that you are aware of would be sedentary as opposed to light duty.  Ms. Pollock is currently 58 years old.  Let me change that.  I'm going to withdraw that question.  Well, actually, I think I will ask it.  Assuming that only sedentary work would be available to Ms. Pollock, just for the assumption, and she is 58 years old, would the sedentary jobs that you are looking at be potentially similar enough to her bookkeeping work that she would need to make very little, if any, vocational adjustments, in terms of tools or process or setting for the industry?

A       I believe functioning as a bookkeeper, which is an SVP 6, that - - for example, a bill rate clerk is at SVP 4, and accounts payable - -

Q       [INAUDIBLE] - -

A       That's okay.

Q       - - SVP 6.

A       SVP 6, and these other jobs that I can give you would be at 4s and 5s, like bill rate clerk or accounts payable clerk.

Q       I'm sorry.

A       Bill rate clerk.

Q       Mr. Bell, could you also give us a DOT exemplary number for the bank teller job, the bill rate clerk, and the accounts payable clerk positions that you've testified about?

A       Yes, the bank teller is 211.362-018.  The bill rate clerk is 214.362-042, and the accounts payable clerk, 216.482-010.

Q       Would there be any problem with these types of jobs, bookkeeper, bill rate clerk, bank teller, or accounts payable clerk, if there was a request for accommodation for equipment to allow a person to read fine print?

A       If visual accommodation were available then I don't believe that - - I believe that most location would allow for that, especially if you were in government-contracted jobs.

Q       For the fifth RFC, I want you to assume the same RFC as in RFC number four with the exception that I want you to eliminate the sit/stand option.  Would there be - - what kinds of jobs, if any, would be available at the medium level with the modified RFC, if the sit/stand option was eliminated?

A       Food service worker in a hospital setting, medium, 825,000, nationally, 3,400, regionally; or laundry worker, 375,000, nationally, 2,300, regionally.

Q       Is that also a medium-duty job?

A       Yes.

*               *               *

Q       And then, for the sixth RFC, I'm going to do a little bit of a repeat of questions asked on July 22, 2008, and I'm just going to ask you that you might assume that the testimony provided by Ms. Pollock at her original hearing would be being fully credible regarding her pain complaints and functional limitations, such as she had excessive sleeping due to medication side effects - -

A       I couldn't hear the last thing you said.

Q       Sure, such as excessive sleeping because of medication side effects that could last from 15 to 20 hours per day, difficulty seeing up close with her right eye, and also difficulty walking any types of distances 20' or farther .  There was additional testimony.  These are just a sampling of the facts that Ms. Pollock provided.  If you assume that these samplings and the other facts to which she testified to about her limitations were deemed credible and supported by the medical evidence, would you maintain your testimony that was given on July 22, 2008, that no jobs would be available under those circumstances?

A       Yes, Your Honor.

*               *               *


E.       Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and

through medical records.  The information is included in the report to demonstrate how

Claimant's alleged impairments affect his daily life:

•       has a driver's license and is able to drive (Tr. 40)

- is able to see the television (Tr. 49)

- has to use reading glasses and a magnifying glass to read (Tr. 49)

- does not clean often (Tr. 52)

- is able to cook (Tr. 52, 153)

- has a friend help with grocery shopping (Tr. 52)

- enjoys taking care of friends (Tr. 52, 152)

- cares for three dogs (Tr. 52)

- is able to read (Tr. 151)

- walks when weather permits (Tr. 151)

- has trouble getting in and out of bathtub (Tr. 152)

- has trouble standing up from toilet (Tr. 52, 152)

- has difficulty climbing stairs (Tr. 152)

- has difficulty sleeping (Tr. 152)

- has poor circulation in her feet (Tr. 152)

- cleans daily (Tr. 153)

- does laundry weekly (Tr. 153)

- cooks and washes dishes daily (Tr. 153)

- goes outside 2-3 times daily (Tr. 154)

- shops 2-3 times weekly (Tr. 154)

- is able to count change, handle a savings account, and use checkbook (Tr. 154)

- watches television for 6-8 hours daily (Tr. 155)

- reads 2 hours daily (Tr. 155)

- does not spend time with others (Tr. 155)

### III. The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant argues that the ALJ's decision to deny the Claimant SSI is not supported by substantial evidence because the ALJ ignored objective medical evidence supporting Claimant's complaints of fatigue and anemia, which occurred while she was on Interferon and Rivavirin therapy. Additionally, Claimant alleges that the ALJ did not indicate why more weight was afforded to the opinion of Dr. Kuzniar concerning Claimant's mental limitations than to the opinion of Dr. Roman.

Commissioner contends that the ALJ's decision is supported by substantial evidence because the Claimant failed to prove that he is disabled as defined by the Act. Commissioner argues that the ALJ correctly found the Claimant "not entirely credible" and gave equal weight to both state agency psychologists who found Claimant's depression a non-severe impairment.

B.    <u>Discussion</u>

I.    Whether Substantial Evidence Supports a Finding that Claimant was not Entirely Credible.

Claimant argues that the ALJ's decision is not supported by substantial evidence because the ALJ ignored objective medical evidence supporting Claimant's complaints of fatigue and anemia, which occurred while she was on Interferon and Ribavirin therapy. Specifically, Claimant alleges that because Claimant established her medically determinable impairments could reasonably cause the symptoms of which she complained, she was entitled to rely exclusively on subjective evidence to show that she could not perform work eight hours per day, five days per week. Commissioner contends that the ALJ correctly found that Claimant's

statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible.

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

Claimant argues that the ALJ improperly rejected Claimant's testimony about her symptoms and side effects by noting only that (1) although Claimant claimed depression, the most recent record from Dr. Shamma showed no symptoms of depression and (2) that her daily activities were not consistent with disability. Claimant relies on Hines v. Barnhart, 453 F.3d 559 (4th Cir. 2006) and Crider v. Harris, 624 F.2d 15 (4th Cir. 1980) to establish that Claimant was entitled to rely exclusively on subjective evidence to show that she could not perform work eight hours per day, five days per week after establishing her medically determinable impairments could reasonably cause the symptoms of which she complained. Claimant's reliance on Crider v. Harris is misplaced. In Crider, a twenty-nine (29) year old plumber, suffering from onset of

multiple sclerosis, was found to be disabled and was awarded DIB and SSI. 624 F.2d, at 16. Crider was found unable to perform his former employment because of side effects of his illness, including loss of eyesight. Id. In coming to this conclusion, the ALJ posed a hypothetical to which the VE replied, "in the event of frequent loss of eyesight by Crider, 'it would fairly eliminate' all of the alternative employment possibilities." Id.

Claimant suggests that this case entitles her to rely exclusively on subjective evidence. However, Claimant's case is distinguishable from Crider. First, in Crider, the record established that on four prior occasions, as a consequence of multiple sclerosis, Crider had become functionally blind. As the VE explained in Crider, "a capacity to see was a sine quo non of any of the suggested alternative jobs." Id. Nowhere does the VE in this case suggest that fatigue or anemia would eliminate the possibility of conducting alternative jobs. Second, and perhaps most importantly, the applicant in Crider appeared pro se. Because Crider appeared pro se, he was "entitled to the sympathetic assistance of the ALJ to develop the record, to 'assume a more active role' and to adhere to a 'heightened duty of care and responsibility.'" Id. (quoting Livingston v. Califano, 614 F.2d 342 (3d Cir. 1980)). The Court recognized this duty to a pro se applicant and "proceeding on the assumption that the ALJ was adhering to those responsibilities in the case of a pro se applicant" found that it could not "ignore the hypothetical predicated on an assumption of frequent loss of eyesight." Id. Taking that view, the Court awarded the applicant benefits. Again, Claimant's case is distinguishable because he is not appearing pro se but has the assistance of counsel. Therefore, reliance on Crider v. Harris is misplaced.

Claimant also relies on Hines v. Barnhart, 453 F.3d 559 (4th Cir. 2006) for further support of her contention that she was entitled to rely exclusively on her subjective complaints.

Though the Court in <u>Hines</u> found that the claimant was entitled to rely exclusively on subjective evidence to prove the second part of the <u>Hunter v. Sullivan</u> test, the Court noted that:

> While objective evidence is not mandatory at the second step of the test, [t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, *they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment*, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d, at 565 (emphasis added) (citing <u>Craig v. Chater</u>, 76 F.3d 585, 595 (4th Cir. 1996).

Therefore, claimants are not automatically entitled to rely exclusively on subjective evidence to show that they are unable to perform work eight hours per day, five days per week.

Additionally, the claimant in <u>Hines</u> suffered from sickle cell anemia. As the Court noted, sickle cell anemia "is particularly insidious because it rarely produces the objective medical evidence that clinicians desire. . . there is no way to demonstrate objectively that a SCD patient has pain . . . ." <u>Id</u>. at 561. "Given the unique characteristics of the disease at issue in this case," the Court held that the ALJ erred. Unlike the claimant in <u>Hines</u>, Claimant is not suffering from a disease that rarely produces objective medical evidence. Therefore, the ALJ is permitted to evaluate the subjective allegations in accordance with the objective medical evidence.

The ALJ must apply the two-step analysis, referenced above, when assessing the credibility of a claimant's subjective complaints of pain. <u>Craig v. Chater</u>, 76 F.3d 585, 595 (4th Cir. 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. <u>Id</u>. Second, once this threshold determination has been made, the ALJ must consider

the credibility of her subjective allegations of pain in light of the entire record.  Id.  "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight."  Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)).  "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference."  See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997).  "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'"  Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)).

The ALJ did not err in assessing Claimant's credibility.  After determining that Claimant had a medically determinable impairment that could reasonably be expected to produce Claimant's alleged symptoms, the ALJ engaged in an analysis to evaluate the intensity, persistence, and limiting effects of Claimant's symptoms to determine the extent to which they limit Claimant's ability to do basic work activities.  (Tr. 16).  The ALJ ultimately concluded that Claimant "is not entirely credible, particularly with regard to her allegations of pain, limitations, and overall disability."  (Tr. 16).  Coming to this conclusion, the ALJ determined that the objective medical evidence did not support the weight and severity of Claimant's subjective allegations of pain and limitations.  (Tr. 16).  Claimant alleges that the ALJ's decision is not supported by substantial evidence because, in finding Claimant's statements incredible, the ALJ only cites (1) the discrepancies between Claimant's complaints of depression and the most recent medical records and (2) Claimant's daily activities.  However, this Court is limited to a substantial evidence review.  The ALJ notes that Claimant "has alleged disability based, at least

in part, upon her symptoms of depression.  More recently, however, the claimant's medical records show that the claimant has reported no symptoms of depression." (Tr. 16).  Additionally, the ALJ relies on Claimant's description of her daily activities setting forth that "claimant reported that she would arise at 6 a.m., usually, test her blood sugar, take her medication and administer her own insulin, which she also did in the afternoon and evenings.  She indicated that she was able to do household chores such as making beds, running a vacuum, dusting, cooking meals, shopping for food, and mopping floors.  She indicated that she liked to hook rugs as a hobby.  The claimant also testified that she lived with three dogs, and took care of their daily feeding and exercise." (Tr. 16).  The ALJ ultimately concluded that "if the claimant were truly disabled, or limited to the degree alleged, she likely could not perform the activities she described." (Tr. 16).

The ALJ correctly followed the two-step test in <u>Craig</u>.  Additionally, the Court finds that more than substantial evidence exists to support the ALJ's decision to discredit Claimant's subjective complaints.

II.     Whether the ALJ Failed to Give Adequate Weight to the State Agency Psychologists.

Claimant argues that the ALJ failed to explain why he relied on the limitations found by Dr. Kuzniar at the reconsideration level over the limitations noted by Dr. Roman when the claim was initially denied.  Specifically, Claimant alleges that the testimony of the VE in response to the ALJ's hypothetical questions illustrates that the weight accorded to the opinions of the two state agency psychologists was determinative of Claimant's claim; however, the ALJ failed to explicitly indicate the weight given to each opinion.  Commissioner contends that the ALJ did not give more weight to the opinion of Dr. Kuzniar but relied equally on both of the state agency

psychologists who found Claimant's depression a non-severe impairment.

After the original hearing on July 22, 2008, the ALJ held a supplemental hearing on September 24, 2008, to present new residual functional capacity hypotheticals to the VE based on reconsideration of the file. After reconsidering the records, the ALJ found that he "incorrectly utilized some nonexertional limitations by the original DDS examiner on mental health matters, which did not appear to have been adopted by the subsequent examiner, Dr. Kuzniar, when he reviewed the file for reconsideration." (Tr. 22).

A VE's opinion, in order to be relevant, must be one that is based on all evidence in the record; therefore, it is necessary for the VE to be given a proper hypothetical upon which he can make a response. The opinion must be based on the claimant's condition as shown by the entire record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments. Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989). The ALJ need only pose those hypothetical questions that are based on substantial evidence and accurately reflect the claimant's limitations. Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988). The ALJ is afforded "great latitude in posing hypothetical questions," Koonce v. Apfel, 1999 U.S. App. LEXIS 307, at 15 (4th Cir. 1999)[5], and need only pose those questions that are based on substantial evidence and accurately reflect the claimant's limitations. Copeland, 861 F.2d, 540-41. All medical opinions are to be considered in determining the disability status of a claimant. 20 C.F.R. § § 404.1527(b), 416.927(b). The opinion of a claimant's treating physician

---

[5] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citations to unpublished opinions. The undersigned recognizes the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

is entitled to great weight and may only be disregarded if there is persuasive contradictory evidence.  Evans v. Heckler, 734 F.2d 1012, 1015 (4th Cir. 1984).

Claimant essentially alleges two errors in the ALJ's hypotheticals posed to the VE.  First, Claimant argues that the ALJ failed to specify why he gave more weight to Dr. Kuzniar's opinion over that of Dr. Roman.  Second, and related to the first issue, Claimant relies on Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984), to argue that the ALJ erred by not explicitly indicating the weight given to each doctor's opinion.

As to Claimant's first argument, the ALJ did not explicitly indicate that he gave more weight to Dr. Kuzniar's opinion.  However, examining the second and related issue, the ALJ did not indicate the weight he gave to either of the doctors' opinions.  The ALJ called a supplemental hearing because he believed he erroneously utilized some of the nonexertional limitations by the original DDS examiner on mental health matters, which were not adopted by the subsequent examiner.  By having a second hearing, the ALJ was able to change his hypotheticals posed to the VE.  This ultimately led the VE to a different conclusion as to Claimant's ability to return to her previous job as a bookkeeper.

Based on a reading of the record, it appears that, because the ALJ held a supplemental hearing and changed the hypotheticals, he must have afforded greater weight to Dr. Kuzniar's opinion.  However, the ALJ does not reference anywhere in the record any weight whatsoever. The Court is therefore left to guess whether there was substantial evidence to support the ALJ's decision.  This, of course, is impermissible.  "We [the courts] cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. . . . The courts . . . face a difficult task in applying the substantial

evidence test when the Secretary has not considered all relevant evidence." <u>Gordon</u>, 725 F.2d, at

235-36 (quoting <u>Arnold v. Secretary</u>, 567 F.2d 258, 259 (4th Cir. 1977).

The ALJ held a supplemental hearing after realizing that he "incorrectly utilized some

nonexertional limitations by the original DDS examiner on mental health matters, which did not

appear to have been adopted by the subsequent examiner, Dr. Kuzniar, when he reviewed the file

for reconsideration." (Tr. 22). After posing different RFC hypotheticals to the VE, the VE

ultimately concluded that Claimant could perform her past relevant employment, contrary to the

outcome of the first hearing. The Court is left only to assume, however dangerous that is, that

the supplemental hearing was held because the ALJ gave more weight to Dr. Kuzniar's opinion

over that of Dr. Roman. However, the Court is unable to ascertain whether the assumption is

correct because the ALJ failed to indicate any weight in his opinion.[6] This was error.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED** and the action be

**REMANDED**. There was substantial evidence supporting the ALJ's decision to discredit

Claimant's testimony; however, the ALJ failed to explicitly indicate the weight given to the

relevant medical evidence.

2.      Commissioner's Motion for Summary Judgment be **DENIED** for the same

reason set forth above.

---

[6] The ALJ's only reference to the opinions of the two state agency physicians is as follows: "The undersigned has considered these opinions and, to the extent that they show that the claimant's ability to perform exertional work or non-exertional work requirements are not grossly restricted, and to the extent that the opinions seem consistent with the majority of the objective findings in the medical evidence, the undersigned agrees with them." (Tr. 16).

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: October 16, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE